UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA,       )
                               )     CRIMINAL NO. 06-10414-DPW
                               )
          v.                    )
                               )
                               )
JAMES WERRA,                    )
     Defendant.                 )
_____)
```

MEMORANDUM AND ORDER
September 11, 2008

Defendant James Werra has been charged in a one-count indictment with possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He seeks to suppress the firearm seized during a search of his person conducted by the Brockton Police on November 10, 2006.  For the reasons discussed below, I will deny the motion to suppress.  Because the facts and circumstances presented by the motion offer the potential for multiple branches to the decision tree, however, I also address related disputes whose resolution may become the predicate for an alternative analysis or disposition of the motion to suppress.

**I. FINDINGS OF FACT**

*A.   The Background*

On November 10, 2006, at approximately 10:00 a.m., Brockton Police Detective Michael Schaaf was driving with Massachusetts State Trooper Robert Fries in Brockton.   The two were taking

1

part in an initiative to arrest people for whom arrest warrants had been issued.  One person with an arrest warrant outstanding for whom Schaaf and Fries were looking was Jeanine Daley.  Schaaf and Fries received information from "Christine," an informant, that Daley was staying at 63 Menlo Street and that Christine had seen Daley there recently.  Christine had provided Schaaf with reliable information concerning the location of a suspect in the past.  Schaaf and Fries proceeded to drive to 63 Menlo Street.

   B.   *The 63 Menlo Street Residence*

   Menlo Street is located in a residential neighborhood.  The lease to 63 Menlo Street was in the name of Jeffrey Cicerano and he paid most of the $3000 monthly rent.  Cicerano had his own bedroom on the first floor, and he maintained control over the adjacent living room.  There was also a kitchen on the first floor where other residents would sometimes congregate.  No door separated the kitchen from the entrance foyer.

   The defendant, James Werra, paid Cicerano to rent the third floor, which had a bedroom, a kitchenette and a bathroom. Werra's girlfriend and her child had previously lived there with Werra but moved out before November 10.  The third floor was Werra's personal space and he had the ability to keep people out of that part of the building.  In addition to renting the third floor, Werra sometimes - "not a lot but once in a while," according to Cicerano - slept on the couch in the living room on the first floor, with Cicerano's permission, because people would "party" on the third floor.

Other people also lived at the address and contributed money for rent.  Mika (or "Miko") Brown and Jeanine Daley paid Cicerano to live on the first floor.  A person named Paul, whose last name Cicerano could not remember, rented a room on the second floor. Additionally, the defendant's brother, Mikey Werra, and his girlfriend had lived in the house and contributed rent at some point, but they had moved out before November 10.

C.   *The Officers Enter 63 Menlo Street*[1]

Upon arriving at 63 Menlo Street, Schaaf and Fries approached the front door and knocked.  Cicerano answered the door.  Schaaf and Cicerano knew each other from Cicerano's past encounters with law enforcement.  Specifically, Schaaf had previously arrested Cicerano on an outstanding warrant.  Before arriving, Schaaf believed 63 Menlo Street to be a "rooming house" operated as a sober house, but after seeing Cicerano he became concerned that 63 Menlo Street had become a drug house.

Standing outside the door, Schaaf asked Cicerano if he could talk to him.  He also told Cicerano that he wanted to talk to the people in the house about drug activity.  Cicerano asked Schaaf

---

[1]As will be apparent from the findings of fact in this section, I largely credit the testimony of Cicerano over that of the officers concerning the circumstances of the officers' entry of 63 Menlo Street.  Without detailing at length the reasons for making this credibility determination, it will suffice to observe that given his personal circumstances and disposition, Cicerano does not appear to me as likely to have consented voluntarily to the entry by the officers.

if he had a warrant.  Schaaf said that he did not and asked if he needed one.[2]  Cicerano told them he did.  Cicerano began to walk away from the front door but turned around when the police started kicking the bottom of the door.  Cicerano asked them what they were doing.  In response, Schaaf threatened to "close the house down."  At that point, Cicerano told Schaaf and Fries that he would come outside to talk, and they agreed.  When Cicerano opened the door, however, Schaaf pushed the door open further and forced his way into the entry foyer.  Cicerano told him he had to leave.  Schaaf responded that they just wanted to talk, but Cicerano repeated that the officers had to leave.  Schaaf then instructed Cicerano to get everyone who was on the second and third floor of the apartment and bring them downstairs.  Cicerano went upstairs.

---

[2] Given the arrest warrant for Jeanine Daley the officers were undertaking to execute, it may at first blush appear odd that Schaaf would not announce he had a warrant in response to Cicerano's question.  But concerns about flight by Daley would arguably justify a less than candid response by Schaaf.  The government, during argument on their suppression motion, appeared to offer an ambivalent response to my question whether it was "contend[ing] that the arrest warrant is sufficient to justify entering the household."  The Assistant United States Attorney said: "I don't think the officers had enough information about the presence of Jeanine Daley in there to rely on the arrest warrant.  I think it was a sufficient basis for the[ir] being in the building and seeking to find her there."  Irrespective of the Government's ambivalence, as will appear below, see infra Section II.B.1, I find that the warrant did indeed authorize the officers' entry.

D.    The Search And Arrest Of Werra[3]

Initially, Schaaf remained in the foyer on the first floor of 63 Menlo Street, while Cicerano went upstairs.  Schaaf looked through a set of pocket doors, which were open enough for him to poke his head through, and he observed Werra in the living room area adjacent to Cicerano's bedroom.  Werra was wearing a t-shirt, a pair of baggy shorts, and sneakers.  Fries also looked into the living room.

The officers saw Werra sitting on a couch and "just sort of staring out into space" in the living room.  Neither Schaaf nor Fries knew who Werra was or that he had an outstanding arrest warrant.  Schaaf asked Werra, "Hey, buddy, are you all right? What's going on?"  Werra did not respond.  At that point, Schaaf heard noise in the foyer and turned from the living room.  Schaaf saw two individuals enter the foyer from a bedroom on the opposite side of the first floor and another individual enter the foyer from the kitchen on the first floor.

After returning his attention to the foyer, Schaaf saw movement out of the corner of his eye.  Schaaf turned and saw Werra walking out of the living room towards him.  Werra's hands

_____

[3] As will become apparent from the findings of fact in this section, I largely credit the testimony of the police officers over that of Werra concerning their search and arrest of Werra. To the degree that Werra may be said to have an adequate recollection of the events, I find his testimony to be lacking in credibility.

were in his front pant pockets, "half in half out" and "moving slightly."  Schaaf observed that Werra had the clip of a concealed pocket knife visible outside his front right pocket. Without telling Werra to remove his hands from his pockets, Schaaf reached and took the knife from Werra's pocket.  Observing that Werra still had his left hand in his front pocket and "was moving a little bit," Schaaf "was not sure if there was another knife in the other pocket or any other weapon."  Schaaf conducted a pat frisk of Werra's pocket and felt a hard object that he identified as a firearm.  At that point, Schaaf removed the firearm and gave it to Fries.  Schaaf then told Werra he was under arrest.  Werra tried to flee, leading to a brief struggle in which Werra was subdued.[4]

## II. CONCLUSIONS OF LAW

Although Werra does not expressly quite make this distinction, in essence he challenges two aspects of the police conduct as grounds for suppression.  First, he claims that the officers' entry into 63 Menlo Street violated the Fourth Amendment.  Second, he asserts that Schaaf's stop and pat-frisk of him violated his Fourth Amendment rights.  As a threshold matter, I first address whether Werra has a sufficient Fourth

---

[4]I note that Jeanine Daley was in fact present at 63 Menlo Street and consequently the outstanding warrant for her was later executed there.  Although the police officers were not aware of it at the time, Werra was also subject to an outstanding warrant.

Amendment interest to mount either of these challenges to police conduct.

A.   *Werra's Expectation of Privacy*

In order for Werra to contest a search or seizure on Fourth Amendment grounds, he bears the burden of demonstrating that he had a legitimate and reasonable expectation of privacy in the premises searched or the thing seized.   *United States v. Dunning*, 312 F.3d 528, 531 (1st Cir. 2002) (per curiam).   I turn now to evaluate whether Werra had a reasonable expectation of privacy either as a resident of 63 Menlo Street or in his own person and associated personal property.

1.   Werra's Expectation of Privacy as a Resident of 63 Menlo Street

Werra's expectation of privacy in the foyer of 63 Menlo Street hinges largely on the proper characterization of the building itself.   The Government contends that Werra lacked a reasonable expectation of privacy in the foyer because the property was essentially a multi-unit apartment building.   The First Circuit has explained that "a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building."   *United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir. 1998).   Common areas are those areas of a building "exposed both to those who have access to that area and those, including law enforcement officers, who may be given permission to enter that

7

area,"[5] and it seems clear that hallways in multi-unit apartment buildings fall into this category. *United States v. Burnette*, 375 F.3d 10, 16 (1st Cir. 2004) (quoting *United States v. Osunegbu*, 822 F.2d 472, 479 (5th Cir. 1987)), *vacated on other grounds*, 543 U.S. 1181 (2005); *see also United States v. Legault*, 323 F.Supp.2d 217, 222 (D. Mass. 2004) (citing with approval *Commonwealth v. Montanez*, 410 Mass. 290, 301-03 (1991), which held that common hallways in an apartment building were common areas). The majority of Circuits that have considered the issue have also concluded that common hallways in multi-unit apartment buildings are common areas where tenants lack a reasonable expectation of privacy. *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993); *United States v. Acosta*, 965 F.2d 1248, 1252-53 (3d Cir. 1992); *United States v. Holland*, 755 F.2d 253, 255-56 (2d Cir. 1985); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977); *but see United States v. Carriger*, 541 F.2d 545, 550 (6th Cir. 1976) (holding that tenants of a multi-unit apartment building had a reasonable expectation of privacy in locked common areas, including common hallways).

Werra, for his part, argues that 63 Menlo Street was a "commune," similar to a "traditional" family home where all

---

[5] It bears emphasizing that my findings of fact have determined that the police officers were not in the foyer with permission. But at this juncture, I consider only whether Werra has standing to object to their presence, whether or not they were there with permission.

residents possess a reasonable expectation of privacy throughout the entire dwelling. *See Payton v. New York*, 445 U.S. 573, 589-90 (1980); *Kyllo v. United States*, 533 U.S. 27, 34 (2001); *United States v. Paradis*, 351 F.3d 21, 27 (1st Cir. 2003); *United States v. Weidul*, 325 F.3d 50, 52 n.1 (1st Cir. 2003).  Consequently, Werra maintains that he had a reasonable expectation of privacy in the foyer.

I agree with the general propositions advanced by both parties.  That is, as the government contends, a person who occupies one unit in a multi-unit apartment building does not have a reasonable expectation of privacy in common areas of the building.  Similarly, as the defendant contends, in a traditional home, all residents possess a reasonable expectation of privacy throughout the entire interior of the building.  But these well-established conventional categories for living arrangements do not bring the main issue here into complete focus because 63 Menlo Street does not fit squarely into the paradigm for either a traditional family home or a multi-unit apartment building.  The required inquiry must therefore ask whether the arrangements at 63 Menlo Street make it more like a traditional family home or more like a multi-unit apartment building.

The parties have not identified, and I have not found, any reported decisions that have, with sustained reasoning, expressly examined the distinction between traditional family homes and

multi-unit apartment buildings.  Determining whether a person has a reasonable expectation of privacy in an area or an item is, of course, a fact-specific inquiry.  Before turning to the details of 63 Menlo Street, however, it may be useful to identify several illustrative factors for analyzing whether a residence is more akin to a traditional home or a multi-unit apartment building.

The most important factor is whether or not the building contains recognizably separate living units.  Distinct, complete living spaces indicate that the dwelling is more like an apartment building because each tenant's functional home is not shared by others in the building.  While each tenant would have a reasonable expectation of privacy in his or her personal living space within that kind of building, that expectation would not extend to common areas shared with other tenants.  By contrast, if the building did not contain compartmentalized living spaces, the residents would effectively be living together in a single, shared unit.  This might occur, for example, where all tenants shared essential parts of the living space, such as bathrooms and kitchens.  In that circumstance, each tenant would presumably have a reasonable expectation of privacy throughout the entire interior of the building.

A related factor is the legal right of a resident to exclude others from certain parts of the building.  *See United States v. Anderson*, 154 F.3d 1225, 1232 n.3 (10th Cir. 1998), *cert. denied,*

526 U.S. 1159 (1999) ("The right to exclude others is an important consideration in determining whether an individual has [a reasonable expectation of privacy].").  The presence or absence of locks may be a factor in making this determination, because it could be a manifestation of a resident's belief that he had the right to exclude others from a particular part of a building.  However, the presence or absence of locks is not a dispositive factor.  It is, for example, conceivable that an apartment building could contain five distinct units and no locks, because the tenants of each unit were friends or the building was located in a safe area.  In that situation each tenant would still presumably have the legal right to exclude others from the unit he or she personally occupied.

The number of people living in a building can also be relevant in categorizing the building.  For example, if 30 people lived in a large building, then it most likely would be characterized as a multi-unit apartment building.  But if three people lived in the same building, it could be either a multi-unit apartment building or a home, depending on how the space was divided and what rights each individual had with respect to that space.

I also note that the formal legal relationship among the residents of a building is not necessarily determinative in classifying the residence as either a traditional home or a

multi-unit apartment building.  For example, if two people living together as a couple each had access to all spaces in the dwelling, then it would be considered a traditional home, whether or not they were legally married.  *See, e.g., United States v. Paradis,* 351 F.3d at 27 (holding that the apartment of defendant's girlfriend was his "home" for purposes of the Fourth Amendment).

With these considerations in mind, I now turn to analyze the 63 Menlo Street residence.  The evidence regarding the 63 Menlo Street building lacked many details concerning the rights of the residents within the building and the relationships among those who lived there.  Neither Cicerano nor Werra offered detailed testimony about the respective rights of each of the residents in the building.  For example, it is unclear whether the residents shared bathrooms and kitchens, to precisely what extent they were assigned specific parts of the building, and whether they locked doors to keep other people out.  In the absence of these key facts, I find that Werra has not carried his burden of demonstrating that 63 Menlo Street was akin to a traditional home.  Rather, it was more like a multi-unit building where Werra's reasonable expectation of privacy varied for different locations within the building.

Boundaries were sufficiently defined at 63 Menlo Street to afford Werra a reasonable expectation of full privacy in the third floor for which he paid rent.  That area contained a

kitchenette and appears to have been an independent living unit from which Werra could exclude others.  But he had no reasonable expectations of privacy in the foyer because others over whom he had no control could pass through it without his permission.  As to the living room, Werra's expectation of privacy was limited to the permission for use granted by Cicerano.

For these reasons, I conclude Werra does not have standing to challenge the legality of the police's entrance into 63 Menlo Street on Fourth Amendment grounds.  Because he is unable to contest the legality of the police entrance, he is barred from claiming on those grounds that the evidence the police obtained in the subsequent seizure of weapons in the foyer should be suppressed pursuant to the fruit of the poisonous tree doctrine.

2.  <u>Werra's Expectation of Privacy in his Person</u>

The question whether Werra can contest the legality of the police's entrance into the foyer at 63 Menlo Street is separate from the question whether Werra may challenge the stop and pat-frisk that Schaaf conducted of him once circumstances developed inside the building.  Werra had an independent reasonable expectation of privacy in his person and in associated personal property that was not in plain view from the foyer.  In *United States v. Maddox*, the Sixth Circuit explained that an individual "retains, almost wherever he goes, a legitimate expectation of privacy in his person."  944 F.2d 1223, 1234 (6th Cir. 1991); *see also United States v. Thornton*, 493 F.Supp.2d 1024, 1031 (S.D.

13

Ohio 2007) (noting that the Fourth Amendment "expressly provides that [defendant] had a legitimate expectation of privacy in 'the invaded place,' his 'person.'"). For example, although a party guest at another person's apartment does not have a reasonable expectation of privacy for items found within the apartment, he does "retain his preexisting expectation of privacy in his person and his personal property." *Id.* at 1234 n.4. Likewise, even though Werra's status as a resident of 63 Menlo Street did not provide him with a reasonable expectation of privacy for the foyer of the building, he did retain a reasonable expectation of privacy in his own person while he was there. Consequently, Werra has a sufficient Fourth Amendment interest to challenge the legality of the stop and pat-frisk that led to Schaaf's seizure of the firearm in Werra's pocket.

B.   *The Legality of the Stop and Frisk*

Two distinct inquiries must be made in order to determine whether Werra's Fourth Amendment rights regarding his person were violated by the police. First, did the police have the authority initially to stop or restrain Werra's movements? Second, if they did, did Werra present a sufficient threat to justify the subsequent pat-frisk?

1.   The Stop

Schaaf's restraint of Werra's movements was a seizure for purposes of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and

14

restrains his freedom to walk away, he has 'seized' that person.")  I turn now to consider whether this seizure was a valid investigatory stop under *Terry v. Ohio,* or alternatively, whether it was permissible pursuant to the officers' authority to secure the premises in order to execute the arrest warrant for Jeanine Daley.

> a.   The Stop of Werra was Not Permissible Under
>      *Terry v. Ohio*

The government contends that Schaaf's restraint of Werra was permissible as an investigatory stop.  In *Terry,* the Supreme Court affirmed the constitutionality of investigatory stops in certain circumstances when police lack a warrant or probable cause.  *Id.* at 30.  The Court stated that investigatory stops are permissible when a police officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot."  *Id.*  In a later case, the Court explained that "[b]ased upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  In assessing the totality of the circumstances, police officers may "draw[] inferences and make[] deductions . . . that might well elude an untrained person."  *Id.* at 418.  Additionally, "the evidence . . . must be seen and weighted not in terms of library analysis by scholars, but as understood by those versed in the

field of law enforcement." *Id.* Finally, "[a]lthough an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal quotation marks and citations omitted).  This standard is described as "reasonable suspicion." *Id.*

In this case, the police lacked reasonable suspicion that Werra was himself engaged in any criminal activity.  The only specific facts Schaaf identified to support his decision to stop Werra were that Werra was walking toward him, he had what Schaaf believed to be a knife clipped to his right front shorts pocket, and he was moving his hand a little bit in his front left shorts pocket.  When the totality of the circumstances are taken into account, these facts are not sufficient to give reasonable suspicion to a police officer that Werra was engaged in criminal activity.

When Werra walked into the foyer, Schaaf had already instructed Cicerano to bring other residents of the premises to the foyer.  Other people located on the first floor had also come to the foyer after Cicerano was sent upstairs to gather those present.  In light of what was happening in the residence, Werra's actions of walking into the foyer, when objectively

16

viewed, are not themselves either unusual or suspicious.  When
police enter a building without a warrant, it is not at all
surprising that the commotion would cause residents to come out
of their private spaces to determine what was transpiring.
Werra's mere act of walking toward the police officers did not
provide them with the requisite reasonable suspicion to carry out
an investigatory stop.

Werra's possession of what was likely a concealed pocket
knife also did not provide the officers a basis for a *Terry* stop.
There is nothing in the record that indicates Werra's possession
of the knife was illegal, and no testimony suggests he was
reaching for or brandishing it when he entered the foyer.
According to Schaaf's own testimony, the type of knife Werra had
was common.  Moreover, there seems to have been no way Werra
could have walked through the pocket doors of the living room
without walking directly toward the two police officers.
Furthermore, Schaaf did not testify that Werra was walking
towards him quickly or in a threatening manner.

The movement of Werra's left hand did not provide the police
any better reason to stop Werra under *Terry*.  The police did not
know that Werra possessed a firearm before the pat-frisk, and
they did not observe a bulge in Werra's pocket.  Werra's simple
act of moving his hand around did not provide the police with a
particularized and objective basis for suspecting Werra was

engaged in criminal activity.  As a result, the police officers

were not justified in stopping Werra in a classic *Terry*

investigatory stop.[6]

> b.   The Stop of Werra was Permissible in Securing
>      the Premises to Execute the Arrest Warrant of
>      Jeanine Daley

Although not argued in a developed fashion by the

government, there is an alternative to *Terry* to justify the

effective restraint of Werra's movements in the foyer and the pat

frisk which followed from it.  The officers were permitted to

stop Werra in order to execute the arrest warrant for Jeanine

Daley safely and effectively.  In *Michigan v. Summers*, the

Supreme Court held that a warrant to search for contraband

"implicitly carries with it the limited authority to detain the

occupants of the premises while a proper search is conducted."

452 U.S. 692, 705 (1981).  In *Summers*, police officers approached

a house to execute a search warrant for narcotics and encountered

the defendant walking down the front steps.  *Id*. at 693.  The

officers sought the defendant's assistance in entering the home

and then detained him while they carried out the search of the

premises.  *Id.*  The Supreme Court held that even in the absence

of any individualized suspicion of criminal activity, the

---

[6] While I have considered each of Werra's actions separately
for clarity of analysis, I also find that even when viewed
collectively, they did not provide the police with reasonable
suspicion for a *Terry* stop.

detention was permissible under the Fourth Amendment.  *Id.* at 705
n.19 ("[T]he officer is not required to evaluate either the
quantum of proof justifying detention or the extent of the
intrusion to be imposed by the seizure"); *see also Cherrington v.
Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (explaining that
police officers have the authority to briefly detain "even wholly
innocent bystanders" when executing a warrant).  The Court
explained that when police are executing a warrant, the liberty
interest of an occupant of the premises is outweighed by the
substantial law enforcement interest in exercising "unquestioned
command of the situation" in order to protect the safety of the
officers, execute the warrant in an orderly manner, and prevent
the flight of any suspects.  *Id.* at 702-03.  Although *Summers*
dealt with the execution of a search warrant, several courts have
persuasively extended its application to the execution of arrest
warrants, holding that the same law enforcement interests are
applicable in both scenarios.  *See Cherrington*, 344 at 638;
*United States v. Enslin*, 327 F.3d 788, 797 (9th Cir. 2003), *cert.
denied*, 540 U.S. 917 (2003); *Anderson v. United States*, 107
F.Supp.2d 191 (E.D.N.Y. 2000), *aff'd*, 41 Fed. Appx. 506 (2d Cir.
2002).

The authority of police to detain individuals under *Summers*,
however, is limited by the authority of the police to conduct the
underlying search or arrest.  *See Jacobs v. City of Chicago*, 215
F.3d 758, 772 (7th Cir. 2000) ("[W]here a search is illegal and

not supported by probable cause, the justification for using the search as the foundation for the seizure disappears because it was the connection of the individual with a location suspected of harboring criminal activity that provided the reasonable basis for the seizure."); *Marks v. Clarke*, 102 F.3d 1012, 1032 (9th Cir. 1997) (holding that *Summers* would not "authorize detaining the occupants in furtherance of an illegal search"); *Hill v. McIntyre*, 884 F.2d 271, 278 (6th Cir. 1989) (holding that the reasonableness of a *Summers* detention depended on "the existence of probable cause and on the propriety of the search."). For the detention of Werra to have been permissible under *Summers*, therefore, both the arrest warrant for Jeanine Daley and the manner in which it was executed by the officers must have been proper.[7] The validity of the arrest warrant has not been

---

[7] In *United States v. Leon*, the Supreme Court held that where police officers properly executed an invalid warrant that they reasonably thought was valid, the exclusionary rule should not apply to any subsequently discovered evidence. 468 U.S. 897, 918-19 (1984). The Court, however, limited this exception to cases where "the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant." *Id.* at 918. On this basis, several Circuit Courts have refused to extend the *Leon* "good faith" exception to the improper execution of a warrant. *See United States v. Medlin*, 798 F.2d 407, 410 (10th Cir. 1986) ("Unlike cases in which the police properly execute an invalid warrant that they reasonably thought was valid, in cases of improper execution there is police conduct that must be deterred."); *United States v. Hitchcock*, 286 F.3d 1064 (9th Cir. 2002), *amended on other grounds*, 298 F.3d 1021 (9th Cir. 2002); *see also United States v. Husband*, 226 F.3d 626, 636 (7th Cir. 2000) (noting the court was "not convinced that [*Leon's*] reasoning should be extended to situations where the challenge is to the manner of execution of a valid warrant."). The First

disputed.   The determinative question, therefore, is whether the officers were properly executing the warrant when they detained Werra – in other words, whether the warrant authorized Schaaf and Fries to enter the premises at 63 Menlo Street to search for and arrest Jeanine Daley, even without obtaining the consent of any of the building's residents.

In *Payton v. New York*, the Supreme Court held that an arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 603 (1980).[8]  A majority of Circuits have interpreted *Payton* to mean that the police officers executing the warrant must have a "reasonable belief" that the arrestee: (1) lives at the residence, and (2) is within the residence at the time of entry.  *United States v. Thomas,* 429 F.3d 282, 286 (D.C. Cir. 2005); *cert. denied*, 127 S.Ct. 660 (2006).  The "reasonable belief" standard falls short of requiring the officers to have "probable cause."  *See generally Solis-Alarcon v. United States*, 514 F.Supp.2d 185, 195

---

Circuit has not expressed a view on this issue, but because I find that the officers in this case *did* properly execute the arrest warrant for Jeanine Daley, it is unnecessary for me to address it further here.

[8] By contrast, absent exigent circumstances, police officers must obtain a search warrant to enter the residence of a third party to search for the subject of an arrest warrant.  *See Steagald v. United States*, 451 U.S. 204, 206 (U.S. 1981); *Joyce v. Town of Tewksbury*, 112 F.3d 19, 21-22 (1st Cir. 1997) (en banc) (per curiam).

(D.P.R. 2007) (collecting cases).[9]  Although the First Circuit

has not yet directly confronted this issue, it has suggested in

dictum that it supports the "reasonable belief" standard.  *See*

*United States v. Weems*, 322 F.3d 18, 22 (1st Cir. 2003) (citing

*United States v. Gay*, 240 F.3d 1222, 1226-27 (10th Cir. 2001)).

Therefore, I will apply that standard in this case.  The

existence of a "reasonable belief" is not determined by the

subjective beliefs of the officers, but is instead evaluated

objectively, based on what a reasonable police officer in the

same position would have reasonably believed.  *See El Bey v.*

*Roop*, 530 F.3d 407, 416-17 (6th Cir. 2008); *United States v.*

*Clayton*, 210 F.3d 841, 844-45 (8th Cir. 2000).  *Cf. Bolton v.*

*Taylor*, 367 F.3d 5, 8 (1st Cir. 2004) (applying an "objective

observer" analysis to determine whether there was "reasonable

suspicion" to justify a *Terry* stop).

Although it is a close question, I conclude that the arrest

warrant authorized the officers to enter the premises at 63 Menlo

Street to search for and arrest Jeanine Daley.  Before going to

63 Menlo Street, Schaaf and Fries spoke with an informant named

Christine, who had previously provided Schaaf with accurate

information concerning the whereabouts of a suspect.  Christine

---

[9]Among the Circuits that have considered the issue, only the
Ninth Circuit has come to a contrary conclusion, holding that
*Payton* requires the police to have probable cause that the
subject lives at the residence and is present at the time of
entry.  *See United States v. Gorman*, 314 F.3d 1105 (9th Cir.
2002).

told Schaaf that Daley was "staying at 63 Menlo Street,"[10] and

that she had seen Daley there recently.  Schaaf was also aware

that Jeanine Daley had been a drug abuser, and on his previous

visit to 63 Menlo Street he had observed it to be a sober house

with tenants living on the premises.

To be sure, this evidence is thin.  For example, the

officers did not conduct any surveillance of the premises to

verify that Jeanine Daley was staying there, *see, e.g., Solis-

Alarcon v. United States,* 514 F. Supp. 2d at 193 (finding a

"reasonable belief" of suspect's residence in part because agents

had observed the suspect's car parked at the location), nor did

they seek verification from other sources that she was indeed a

resident, *see, e.g., United States v. Pelletier*, 469 F.3d 194,

197 (1st Cir. 2006) (finding a "reasonable belief" of suspect's

residence in part because officers confirmed with maintenance

worker that suspect was sole occupant of a motel room).

Furthermore, the arrest warrant for Daley indicated a different

address: 10 Marshall Road in North Easton.

Nonetheless, considering the circumstances in their

entirety, I find that the officers had a sufficient basis to form

a "reasonable belief" that Jeanine Daley lived at 63 Menlo

Street.  The tip that Daley was "staying at" that address came

---

[10] Fries could not recall whether Christine provided the
precise address but did recall that she provided enough
information that Schaaf could identify the building to which she
was referring.

23

from a previously reliable informant and was consistent with what
Schaaf knew about both Daley's drug abuse and the building at 63
Menlo Street. *See United States v. Lauter*, 57 F.3d 212, 215 (2d
Cir. 1995) (holding that a tip from a reliable informant that a
suspect recently moved into a particular apartment was sufficient
to justify a "reasonable belief" that the suspect lived there);
*see also Thomas,* 429 F.3d at 286 (accepting, without any further
details, that officers had a "reasonable belief" a suspect lived
at a particular address because they had done an
"investigation").  The fact that Menlo Street may not have been
Daley's permanent home, if indeed she had one, is not
determinative.  For the purposes of a *Payton* analysis, a
suspect's residence can include not only the suspect's permanent
home but also a temporary residence, such as a motel room where
the suspect effectively lived at the time of the entry.  *See
United States v. Pelletier*, 469 F.3d 194, 199 (1st Cir.  2006);
*see also United States v. Weems*, 322 F.3d 18, 22 (1st Cir. 2003)
(noting in dictum that if the defendant "effectively lived" where
he was found, "the arrest warrant itself would be enough to
authorize entry . . . to effectuate his arrest").  *But see Perez
v. Simmons*, 884 F.2d 1136, 1141 (9th Cir. 1988) (holding that
*Payton* only allows entry into a suspect's "actual home" and not a
temporary residence).

Furthermore, I find that the officers had sufficient basis
to form a "reasonable belief" that Daley would be present at the

24

time of their entry into the premises.  The officers arrived
relatively early in the morning, at approximately 10:00 a.m., and
Christine told Shaaf that she had seen Daley at that location
"recently."  *See Thomas*, 429 F.3d at 286 ("As for whether the
officers had reason to believe Thomas would be at home when they
executed the warrant, the early morning hour was reason
enough."); *see also United States v. Hayes*, 209 Fed. Appx. 548,
551 (7th Cir. 2006) (per curiam, unpublished) (finding a
"reasonable belief" that suspect would be home at 10:00 a.m.
where suspect was an unemployed drug addict).

Therefore, although the government indicated at oral
argument that it did not believe the arrest warrant was a
sufficient basis for the police to enter 63 Menlo Street without
consent (Tr. 3:12-14, Oct. 15, 2007), I find that a reasonable
officer in the same position could have formed an objectively
"reasonable belief" that Jeanine Daley lived at the premises and
was present at the time of entry.  The arrest warrant gave the
officers the authority to enter the building, and, under *Summers,*
the authority to detain occupants temporarily in order to search
for Daley safely and effectively.[11]  On this basis, I conclude

---

[11] When a search warrant authorizes officers to enter a
residence, they are still required to give notice of their
"authority and purpose" before entering without consent.  *See* 18
U.S.C. § 3109.  Arguably, the officers' failure to inform
Cicerano that they had an arrest warrant for a resident of the
building fell short of this responsibility.  *See Miller v. United
States*, 357 U.S. 301 (1958); *but see United States v. One Parcel
of Real Property*, 873 F.2d 7, 9-10 (1st Cir. 1989) (noting that

25

that the officers had sufficient justification for initially
stopping and restricting Werra's movements, and I now turn to
consider the propriety of the pat-frisk.

   2.   The Pat-Frisk

   Simply because a stop can be made does not necessarily mean
that a police officer may conduct a frisk of the stopped
individual.  Rather, an officer generally "must be able to point
to particular facts from which he reasonably inferred that the
individual was armed and dangerous" in order to conduct a frisk.
*Sibron v. New York*, 392 U.S. 40, 64 (1968).  *See also Ybarra v.
Illinois*, 444 U.S. 85, 93 (1979) (holding, by analogy to *Terry*,
that an officer executing a search warrant may only frisk persons
present "to find weapons that he reasonably believes or suspects
are then in the possession of the person he has accosted.").
Police do not need to be absolutely certain that an individual is
armed or dangerous, but the evidence must demonstrate that "a
reasonably prudent man in the circumstances would be warranted in
the belief that his safety or that of others was in danger."
*Terry v. Ohio*, 392 U.S. at 27.  The determinative question,

---

"an express announcement would be a useless gesture if the
house's occupant already knew the police's purpose").  Even so,
violations of the so-called "knock and announce" rule do not
require application of the exclusionary rule to subsequently
discovered evidence, where the police had a valid grant of
authority to enter the target's residence.  *See Hudson v.
Michigan*, 547 U.S. 586, 596 (2006); *United States v. Jones*, 523
F.3d 31, 36 (1st Cir. 2008).  It is therefore unnecessary to
resolve this issue here.

therefore, is whether a reasonably prudent police officer would have been warranted in concluding that Werra posed an objective threat of danger to the police or others.

I find that under the circumstances confronting the officers the pat-down frisk of Werra was justified. According to Schaaf's testimony, after Werra walked into the foyer, Schaaf stopped him and removed the knife that was clipped to his pocket "for [Schaaf's] safety, [Werra's] safety, and also Trooper Fries' safety." This seems a prudent step given that the officers were seeking a fugitive in a building with multiple floors and at least several occupants. To be sure, Werra did not appear to pose an imminent threat to the police officers at that point; as I have discussed, Werra's act of walking into the foyer was not unusual under the circumstances and was not itself threatening. Nevertheless, the officers' suspicion that the premises was being used as a drug house, when coupled with the readily identifiable knife clipped to Werra's pants and his act of walking into the foyer, formed a sufficient basis for an objective officer to conclude that Werra was armed and potentially dangerous - even if it was not a sufficient basis to conclude Werra was himself engaged in criminal activity. *See* Section II.B.1.a, *supra*. With the knife in one pocket, Werra's act of moving his hands slightly in his other pocket as he approached Schaaf lent further support for the conclusion that he posed a potential threat to the safety of the officers. Consequently, Schaaf's seizure of Werra's knife

27

and his pat-frisk of Werra's pocket were justified.

## II. CONCLUSION

For the foregoing reasons, I DENY Werra's motion to suppress.


_**/s/ Douglas P. Woodlock**_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE